Sheila **BREWER**, Mark Fleisher, Ramon Huerta, Marie Loague, Jay Miller, Vodene Patterson and Eliu R. Romero, on behalf of themselves and others similarly situated, Plaintiffs,

v.

**SOUTHERN UNION COMPANY and Southern Union Gathering Company, Defendants.**

**STATE OF NEW MEXICO, ex rel., DEPARTMENT OF FINANCE AND ADMINISTRATION, et al., Plaintiffs,**

v.

**SOUTHERN UNION COMPANY and Southern Union Gathering Company, Defendants.**

**Civ. A. Nos. 83–F–1173, 83–F–1174.**

United States District Court, D. Colorado.

Sept. 21, 1984.

J.E. Gallegos, Arturo L. Jaramillo, Steven Tucker, Jones, Gallegos, Snead & Wertheim, Santa Fe, N.M., for plaintiff in the Brewer and State cases.

Russell Moore, Keleher & McLeod, Albuquerque, N.M., for plaintiff Public Service Co. of N.M.

Robert F. Hill, Hill & Robbins, Denver, Colo., for plaintiffs.

Robert F. Hanley, Kenneth Fimberg, Melanie Vogl, Morrison & Foerster, Denver, Colo., James Brosnahan, Thomas Lee, Cedric Chao, Morrison & Foerster, San Francisco, Cal., Victor R. Ortega, Montgomery & Andrews, Santa Fe, N.M., Hal Sanders, Strasburger & Price, Dallas, Tex., Walter

A. Steele, White & Steele, Denver, Colo., for Southern Union defendants.

## MEMORANDUM OPINION AND ORDER AWARDING ATTORNEYS' FEES AND LITIGATION EXPENSES ORDER NO. 1984–39

SHERMAN G. FINESILVER, Chief Judge.

BEFORE THE COURT is a Final Petition of Plaintiffs' Counsel for Allowance of Attorneys' Fees and a Final Report and Petition for Reimbursement of Litigation Costs, both filed on June 15, 1984. This action is prompted by a recent court-approved settlement between the parties and several prior settlements between plaintiffs and other defendants.

This immediate litigation and resulting settlement is unique in that it marks an unusual set of facts not found in other antitrust or price fixing litigation. In its settlement of this price fixing suit brought by plaintiffs (past and present consumers of natural gas in New Mexico) and Public Service of New Mexico, Defendant Southern Union Co. agreed to sell its New Mexico gas supply operation to Public Service Co.

In essence, Public Service will purchase the operation for approximately $173.5 million—$51.5 million less than book value. Out of the money Public Service Co. will save by purchasing the gas supply operation at less than book value, Public Service Co. will pay $32.6 million to the consumer class and $2.3 million to the State Plaintiffs.

This distinctive, far-reaching, three-way arrangement and the hard fought extensive negotiations leading up to it, coupled with the overall irregular course of the litigation with all defendants, must be considered in our award of attorneys' fees and costs.

This litigation encompasses three separate but closely related antitrust cases initially filed in the United States District Court for the District of New Mexico.[1] Early in the proceedings the three cases were consolidated for pretrial and discovery procedures with two other similar cases filed in the United States District Court for the Northern District of Texas. All five cases alleged violations of section one of the Sherman Act, 15 U.S.C. § 1. The plaintiffs asserted that the defendants and others conspired to fix the wellhead price of natural gas in the San Juan Basin region of the State of New Mexico.

In the four years since the first case was filed several settlements were negotiated which resolved the Texas cases. In addition other settlements eliminated the claims against all defendants in the three New Mexico cases, save those against Southern Union Company and Southern Union Gathering Company ("Southern Union").[2]

On April 12, 1984 the parties to the remaining cases informed the court that a settlement had been reached which would, if approved, resolve all remaining claims and end this protracted litigation. The parties are plaintiffs—Brewer class members, State of New Mexico and Public Service of New Mexico and defendant Southern Union Company. The three plaintiff groups are: (1) the Brewer class—past and present New Mexico natural gas consumers; (2) various New Mexico state agencies and educational entities; and (3) Public Service Company of New Mexico. The other parties to the agreement are the Southern

---

**1.** The third case is entitled *Public Service Company of New Mexico v. Southern Union Company, et al.,* Civil Action No. 83–F–1175. That action was filed in June of 1981. The Public Service Company of New Mexico ("PNM") settled with the last defendants at the time the two other cases were finally resolved. PNM and its attorneys have a fee arrangement that does not require court adjudication.

While the three cases were dismissed, we specifically retained jurisdiction to award attorneys' fees and to address matters concerning distribution of the settlement funds. *See* Order No. 1984–32 at pg. 31.

**2.** In July of 1981 defendant Supron settled with all plaintiffs. In September of 1981 defendant Southland Royalty Company also settled. Finally, in January of 1984 the court approved a settlement with the defendants Conoco, Inc. and Consolidated Oil & Gas, leaving only the claims against Southern Union to be tried or settled.

Union Company and the Southern Union Gathering Company, the remaining defendants in this litigation. On April 17, 1984 the court conducted a hearing to determine whether the proposed settlement should be given preliminary approval under Rule 23(e) of the Federal Rules of Civil Procedure ("F.R.C.P."). On April 20, 1984 the court granted preliminary approval to the settlement as proposed.[3]

On June 29, 1984 the court held a second hearing to determine whether the settlement should be given final court approval. Thereafter, on August 1, 1984 the court issued orders granting final approval and dismissing the three related cases.[4] 607 F.Supp. 1491.

Having granted final approval to this last settlement, it is now appropriate to consider plaintiffs counsels' petitions seeking an award of attorneys' fees and litigation expenses for the immediate and earlier settlements.

## I. SUMMARY OF ORDER

The plaintiffs in case number 83–F–1173 are some 350,000 past and present residential consumers of natural gas served by Southern Union within the State of New Mexico. On January 27, 1981, Chief Judge Howard Bratton of the United States District Court for the District of New Mexico entered an order pursuant to Rule 23 of the F.R.C.P. certifying a class to represent all similarly situated residential consumers.[5]

The settlements negotiated between the plaintiff class (the "Brewer class") and the various defendants have resulted in the accumulation of a class settlement fund in the amount of $74,800,000. It is from this common fund that any award of attorneys' fees to class counsel will be paid. Pursuant to an employment agreement entered into between the class representatives and counsel the amount of attorneys fees awarded shall be as provided by law and determined by the court.

The plaintiffs in case number 83–F–1174 are various New Mexico State governmental agencies and educational entities. The total amount of all settlements reached between these plaintiffs and all defendants is $5,028,000. Pursuant to certain employment agreements entered into between the plaintiffs and their counsel, attorneys' fees shall be paid out the settlement funds as awarded by the court in an amount that is fair and reasonable considering all the circumstances.[6]

In accordance with the terms of the settlement between the Brewer and State plaintiffs and the Southern Union defendants, these plaintiffs are to be paid $750,000 for reimbursement of litigation expenses upon closing of the settlement.[7] Counsel for the Brewer and State plaintiffs have filed a petition for reimbursement of litigation costs accrued from inception of the lawsuits through May 31, 1984.

We have carefully reviewed the Final Petition for Allowance of Attorneys' Fees as well as the supporting memorandum and affidavits of counsel. It is our view that the attorneys' fees awarded to *class* counsel must be calculated based on the so-called "lodestar" approach appropriately modified to take into account other factors and circumstances. Further, the fees to be paid counsel for the state plaintiffs should be calculated in the same manner to assure uniformity and consistency in the two related awards.[8]

**3.** *See* our Order No. 1984–21.

**4.** *See* our Orders No. 1984–32, 1984–34 and 1984–35.

**5.** *See* Chief Judge Bratton's Order dated January 27, 1981 and our Order 1984–20 expanding the class.

**6.** The employment agreements may be found as Exhibits A–1, A–2 and A–3 to the Final Petition for Allowance of Attorneys' Fees filed on June 15, 1984.

**7.** *See* Agreement Between Plaintiffs Concerning Final Settlement in MDL–403, at pg. 2, dated April 12, 1984.

**8.** The plaintiffs in the State case have not suggested that a different method be used to calculate a reasonable attorneys' fee in their case, nor do we see any basis for utilizing a different approach.

Having carefully considered the number of hours expended on the cases, the reasonable hourly rates and other factors discussed below, we award attorneys' fees to Brewer and State attorneys as follows:

**Brewer Case 83–F–1173:**
 Jones, Gallegos, Snead &
 Wertheim: $7,551,575.97
 Hill & Robbins: $260,473.08
**State Case 83–F–1174:**
 Jones, Gallegos, Snead &
 Wertheim: $209,438.40
 Hill & Robbins: $17,364.87

The amounts listed above reflect attorneys' fees awarded for the period from March of 1978 through April 17, 1984. The fees awarded have been reduced by the amount of interim awards previously allowed by the court.

The court has also reviewed the petition for reimbursement of litigation costs incurred during the course of the representation of the Brewer and State plaintiffs. After a thorough analysis we are of the view that the full amount requested should be awarded to plaintiffs' counsel as follows:

**Litigation Expenses 83–F–1173/83–F–1174:**

Jones, Gallegos, Snead & Wertheim: $722,768.58

This amount reflects all expenses incurred through May 31, 1984 less payments received through that date.

Below we discuss the methods and rationale used to arrive at the amounts awarded. In addition, a schedule for payment is also outlined as well as the procedure to be followed to seek payment for future fees and expenses.

We recognize that, at first glance, the amount of attorneys' fees allowed in this litigation might appear high. On closer inspection and analysis, however, the fees awarded represent less than 14¢ of every dollar returned to the plaintiffs through the efforts of counsel. By the settlement, the consumer class has virtually made full recovery for monies lost as a result of alleged price fixing activities of Defendant Southern Union and other defendants. In addition, the non-monetary benefits conferred upon the plaintiffs are substantial and must also be weighed in considering whether the fee awarded lacks fairness. These non-monetary benefits, as discussed below, are significant and will be beneficial to New Mexico natural gas consumers for years to come. We strongly believe that when one considers *all* the benefits inurring to the plaintiffs as well as the other facts and circumstances unique to this case, the fee awarded is fair and reasonable.

## II. REPRESENTATION OF PLAINTIFFS

The Brewer class plaintiffs have been represented from the outset of this litigation by the law firm of Jones, Gallegos, Snead & Wertheim, Santa Fe, New Mexico ("Jones firm"). Pursuant to an agreement with the Attorney General of the State of New Mexico, the state agency plaintiffs have also been represented by the Jones firm since filing suit in September of 1979. Finally, the educational institution plaintiffs each agreed to representation by the Jones firm at the time their claims were joined with those of the several state agencies.

In April of 1983, this consolidated litigation was transferred to the United States District Court for the District of Colorado. Pursuant to Rule 301 of this court's Local Rules of Practice, the Brewer and State plaintiffs retained the law firm of Hill & Robbins, Denver, Colorado to represent them as local counsel before the court ("Hill firm"). No law firms other than Jones and Hill have been involved in the representation of the Brewer and State plaintiffs.

## III. HISTORY OF LITIGATION [9]

This litigation has presented three different courts with many complex procedural and legal issues throughout the past four years. The first suit was filed by the Brewer class representatives in July of 1979 in the United States District Court for the District of New Mexico. Two months later, the State plaintiffs filed a similar action, also in the District of New Mexico. Each suit alleged violations of section one of the Sherman Act, 15 U.S.C. § 1, and sought monetary damages and injunctive relief.

During the same time period two other lawsuits, based on the same facts and alleging similar violations of the antitrust laws, were filed in the United States District Court for the Northern District of Texas. In September of 1979 the Southern Union entities, named as defendants in all four lawsuits, filed a motion before the Judicial Panel on Multidistrict Litigation seeking to have the four cases consolidated for pretrial proceedings pursuant to 28 U.S.C. § 1407.[10] Thereafter, substantial briefing and oral argument took place, the primary focus of which was the proper court to be assigned the consolidated litigation. The record before us establishes that counsel for the Brewer and State plaintiffs were actively involved in this matter. In December of 1979 the four cases were consolidated and assigned to the Honorable Howard Bratton, Chief Judge for the U.S. District Court for the District of New Mexico, *In Re New Mexico Natural Gas Antitrust Litigation*, 482 F.Supp. 333 (J.P.M.L. 1979).

In January of 1980, however, Judge Bratton, acting *sua sponte*, removed himself from the case on the basis of a potential benefit to him should the plaintiffs succeed in their claims against the named defendants. This decision was appealed and, after expedited briefing, Judge Bratton's decision was reversed by the Court of Appeals for the Tenth Circuit, *In Re New Mexico Natural Gas Antitrust Litigation*, 620 F.2d 794 (10th Cir.1980). While commending Judge Bratton for his strict adherence to judicial integrity, the Court of Appeals found his potential benefit too inconsequential and insufficient to warrant recusal.

Thereafter, Judge Bratton established a comprehensive discovery schedule on class certification and liability issues. Again, the record before us establishes that a great deal of time was spent researching, briefing and arguing opposing views on the matter of certification of the Brewer class under Rule 23 of the F.R.C.P. In addition, numerous discovery disputes arose which required argument by counsel and adjudication by the court.

On January 27, 1981, Judge Bratton entered orders certifying the putative class under Rule 23 of the F.R.C.P. Thereafter, the parties continued their investigations in regard to various liability issues. In November of 1981 the defendants filed dispositive motions for summary judgment under Rule 56 of the F.R.C.P., accompanied by voluminous briefs, affidavits, and statements of undisputed facts. Dispositive motions and supporting documents were also filed by plaintiffs in late 1981. The motions presented numerous unique legal issues premised on a fact pattern dissimilar to other complex antitrust litigation. These issues included matters pertaining to the existence of a violation of 15 U.S.C. § 1 as well as questions regarding the availability of affirmative defenses such as the statute of limitations, state action defense and the safe harbor provided by the so-called *Noerr-Pennington* doctrine. The briefs and statements of undisputed facts ran into hundreds of pages.

In January of 1982, less than one month before trial, Judge Bratton entered an extensive order denying all motions for summary judgment. The court left open the

---

**9.** For a complete background of the litigation, reference should be made to Order No. 1984–32 entered August 1, 1984.

**10.** As mentioned in footnote 1, the third New Mexico case was filed by PNM in June of 1981 and was consolidated with the other cases shortly thereafter.

question whether the facts alleged would support a *per se* violation of 15 U.S.C. § 1 or whether the case should be analyzed under the "rule of reason" approach.

In February of 1982 trial commenced on liability issues only. The trial took place in Las Cruces, New Mexico and lasted nearly eight weeks. In late March the jury returned a verdict in favor of plaintiffs and against defendants on all liability issues. Shortly thereafter the defendants filed several post-trial motions including a motion for recusal of Chief Judge Bratton.

In May of 1982 Judge Bratton again recused himself and the matter was assigned to Judge David K. Winder of the U.S. District Court for the District of Utah. The defendants filed additional motions including motions to set aside all prior rulings of Judge Bratton and a motion to vacate the liability verdict due to jury irregularities. Again, substantial briefing took place as well as oral argument before the court in Salt Lake City, Utah. Ultimately, Judge Winder ruled that certain conduct on the part of one of the jurors in answering voir dire questions required that the verdict be set aside and the case retried. However, Judge Winder rejected defendants' argument that Judge Bratton's recusal required all prior orders also be set aside.

In April of 1983, Judge Winder recused himself and transferred the case to the District of Colorado for trial. On July 1, 1983, the litigation was assigned to this court. Thereafter, a trial date was set for April 9, 1984 on both liability and damages issues. The parties had, meanwhile, filed a second round of summary judgment motions raising all issues first brought before Judge Bratton and Judge Winder. Again the briefs and statements of undisputed facts exceeded 500 pages in length.

In January of 1984, the plaintiffs filed a motion to reinstate the earlier jury verdict based on newly discovered facts and a recent change in the applicable law announced by the Supreme Court. This issue was also extensively briefed by all parties.

On January 6, 1984 the court ruled on all outstanding motions for summary judgment.[11] On February 2, 1984, the court denied plaintiffs' motion to reinstate the jury verdict.[12]

During January and February of 1984, the parties briefed and argued extensive dispositive motions on damages issues. In addition, issues surfaced which presented questions of first impression. Having studied and conducted independent research on the motions the court was nearing a ruling when, less than a month before trial, the parties announced that a proposed settlement had been reached.

To summarize, this litigation has been before the Judicial Panel on Multidistrict Litigation and three separate District Courts. In addition an appeal was taken to the Court of Appeals for the Tenth Circuit. Various courts have ruled on two substantial rounds of summary judgment motions. Further, a trial on liability issues was held and a verdict returned only to be set aside because of juror irregularities. Thereafter, extensive damages motions were briefed and argued and the case prepared for a ten week trial on all liability and damages issues. That preparation was nearly complete when the litigation was settled.

In all, the case has been aggressively litigated since its inception in July of 1979. The irregular and multi-faceted course of this litigation has a bearing on the attorneys' fees to be awarded.

## IV. NOTICE TO THE CLASS

On April 20, 1984 the court entered Order No. 1984–21 giving preliminary approval to the settlement between the Brewer class and the Southern Union defendants. On May 2, 1984 we entered Order No. 1984–25 which approved the four separate forms of notice to be used to advise the class of the terms of the proposed settlement. Each of the forms advised class

---

**11.** *See* our Order No. 1984–3, dated January 6, 1984.

**12.** *See* our Order No. 1984–8, dated February 2, 1984.

members that a hearing was set for June 29, 1984 to determine whether to grant final approval to the settlement and to consider the final petition for award of attorneys' fees filed by class counsel. Each notice also informed class members that the fees requested would not exceed 15% of the total settlement fund.

In Order No. 1984–32 the court granted final approval to the settlement between the Brewer class and the Southern Union defendants. In that order we discussed the notice procedures utilized and found that they fully and adequately apprised the class members of the .terms of the settlement.

We now hold that the notice procedures also fully apprised the class members of the nature of counsel's fee request as well as the procedures to be used to comment upon or object to that request. We specifically incorporate by reference in the present order our discussion of the adequacy of the notice to the class contained in Order No. 1984–32.

## V. METHOD OF CALCULATING ATTORNEYS FEES

By virtue of the various settlements reached over the course of this litigation plaintiffs' counsel have succeeded in accumulating a settlement fund in the amount of $74,800,000 for the benefit of the plaintiff class. In addition, settlements in the aggregate amount of $5,028,000 have been achieved on behalf of the State plaintiffs.

■ Rule 23 of the F.R.C.P. does not address the trial court's authority or responsibility to set and award attorneys' fees following the settlement of class action lawsuits. Nevertheless, the case law makes it clear that the court has the necessary equitable power to provide that a fair and reasonable fee be awarded out of the common fund created for the plaintiff class. *Boeing Co. v. VanGemert*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Mills v. Electric Autolite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Sprague v. Ticonic National Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1938);

*In Re King Resources Co. Securities Litigation*, 420 F.Supp. 610, 628 (D.Colo.1976). As the Supreme Court in *Boeing Co. v. VanGemert* explained:

> ... a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole ... The common-fund doctrine reflects the traditional practice in courts of equity, ... and it stands as a well recognized exception to the general principle that requires every litigant to bear his own attorney's fees ... The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.

*Boeing Co. v. VanGemert, supra*, 444 U.S. at 478, 100 S.Ct. at 749 (citations omitted).

While it is clear that an award of attorneys' fees from the common fund is appropriate, the courts have not adopted a uniform approach for the calculation of a fair and reasonable fee award. In the past, some courts utilized a percentage of the total recovery as the best measure of a fair and reasonable fee. Under this approach the court would award attorney's fees based solely on the size of the fund and without an analysis of the means used to arrive at the appropriate percentage. This procedure has been heavily criticized, and no recent cases have utilized it. *See*, e.g., *West v. Capitol Federal Savings & Loan Assoc.*, 558 F.2d 977, 981 (10th Cir.1977); *Black Gold, Ltd. v. Rockwool Industries, Inc.*, 529 F.Supp. 272, 274 (D.Colo.1981), rev'd. on other grounds, 732 F.2d 779 (10th Cir.1984); *Knutson v. Daily Review, Inc.*, 479 F.Supp. 1263, 1268 (N.D.Cal.1979).

A second approach has been to weigh and evaluate a number of factors in determining a fair and reasonable fee award. Among the criteria to be considered are the number of hours reasonably expended on the case and the reasonable hourly rate charged by the attorneys. Under this method, however, these two factors carry

no more significance than several others that may be considered depending on the facts and circumstances unique to the case. This approach is perhaps best exemplified by such cases as *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974) and *In Re King Resources Co. Securities Litigation*, 420 F.Supp. 610 (D.Colo.1976). Indeed, prior to the decision in *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983), the Tenth Circuit Court of Appeals had expressly approved of the approach discussed in *Johnson v. Georgia Highway Express, See, Battle v. Anderson*, 614 F.2d 251 (10th Cir.1980); *Francia v. White*, 594 F.2d 778 (10th Cir.1979).

A third method for calculating a reasonable fee award is the so-called "lodestar" analysis first discussed in *Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973) ("*Lindy I*") and *Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir.1976) ("*Lindy II*") (Appeal after Remand). This method has been gaining increasing popularity in recent years. As described in *Lindy I* and *Lindy II* this method starts with a determination of the number of hours reasonably expended on the case as well as a reasonable hourly rate associated with the hours spent. The two multiplied together establish the "lodestar". Thereafter, under the most restricted approach, the lodestar may be modified up or down to reflect (1) the contingent nature of success in the action and (2) the quality of the work performed.

A variation of the lodestar approach has been the subject of judicial and scholarly comment. This fourth method of calculating attorney's fees is really nothing more than a combination of the second and third methods outlined above. The lodestar calculation is used as a starting point, but with subsequent modification to reflect other subjective factors.

Frequently courts have utilized the twelve factors discussed in *Johnson v. Georgia Highway Express, supra*, to alter, when appropriate, the fee amount first derived by the lodestar calculation. *See, e.g., Ramos v. Lamm*, 713 F.2d 546 (10th Cir. 1983); *McCann v. Coughlin*, 698 F.2d 112 (2d Cir.1983); *Dowdell v. City of Apopka, Florida*, 698 F.2d 1181 (11th Cir.1983); *Cooper Liquor Inc. v. Adolph Coors Co.*, 684 F.2d 1087 (5th Cir.1982); *Jones v. MacMillan Bloedel Containers, Inc.*, 685 F.2d 236 (8th Cir.1982); *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830 (9th Cir.1982). Even the courts expressing a stricter adherence to the more traditional lodestar calculation have indicated that other factors may be considered if they have a bearing on the appropriate fee award, *Furtado v. Bishop*, 635 F.2d 915 (1st Cir.1980); *Bagby v. Beal*, 606 F.2d 411 (3d Cir.1979); *Waters v. Wisconsin Steel Works of Intl. Harvester Co.*, 502 F.2d 1309 (7th Cir. 1974); *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976).

This court has, in the past, calculated attorneys' fees awards based on factors similar to those discussed in *Johnson; See, Keyes v. School District No. 1, Denver, Colorado*, 439 F.Supp. 393 (D.Colo.1977); *In Re King Resources Co. Securities Litigation*, 420 F.Supp. 610 (D.Colo.1976); *Oppenlander v. Standard Oil Company (Indiana)*, 64 F.R.D. 597 (D.Colo.1974).

The Supreme Court has itself expressed a preference for determining an appropriate fee award by starting with the lodestar calculation, *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The court, however, specifically stated that other factors may, and in some cases must, be considered in modifying the initial lodestar amount. The court referred with approval to the factors set out in *Johnson v. Georgia Highway Express; Hensley, supra*, 103 S.Ct. at 1940 n. 9.

In *Ramos* the Court of Appeals for the Tenth Circuit discussed the preferred method of calculating attorneys' fees as described in *Hensley*. The Court, however, acknowledged that other factors not subsumed within the lodestar formula may be considered in determining an appropriate fee award.

*Hensley* and a number of the other cases cited above involve fee awards in civil rights cases under 42 U.S.C. § 1988. Nevertheless, we are of the view that where the court is called upon to set a fair and reasonable fee the same general method should be used regardless of the type of case involved.

■ That is not to say that every case must apply the same calculation based on the same factors. The type of case involved and the facts and circumstances presented will have a bearing on (1) the appropriateness of the hours charged to the case, (2) the hourly rate to be utilized, (3) additional factors to be considered and (4) the weight to be given to the factors determined to be relevant to the inquiry. The method suggested by *Hensley, Ramos* and other cases whereby the lodestar is calculated and then other considerations factored in, provides sufficient flexibility to arrive at an appropriate fee award in most cases.

■ The goal in cases where fees are authorized by 42 U.S.C. § 1988 and those where a fee is awarded under the common fund doctrine is the same; the determination of a fair and reasonable fee under the circumstances. In each instance fees must also be sufficient to provide an incentive to attorneys to represent civil rights litigants and those individuals with claims under the antitrust and securities laws, *Hensley, supra* at 1937; *In Re King Resources Co. Securities Litigation, supra* at 636.

The petitioners have suggested that the court utilize the so-called "benefit" approach to determine the proper fee award in this case. Under this method our analysis would begin by determining the fairness of petitioners request for 15% of the total settlements as a fee award. The fairness and adequacy of the award would be determined by considering many of the factors discussed in *Johnson v. Georgia Highway Express, supra; In Re King Resources Co. Securities Litigation, supra;* and *Oppenlander v. Standard Oil Company (Indiana),* 64 F.R.D. 597 (D.Colo.1974). Such factors include: magnitude, complexi-

ty and novelty of the litigation; benefits conferred—results achieved; preclusion of other employment; time and effort expended by counsel; considerations of public policy; pre-existing fee arrangements; etc., *See, Keyes, supra; Oppenlander, supra.*

Petitioners assert that the Supreme Court has recently given its approval to the benefit approach in common fund cases. They point to a footnote in *Blum v. Stenson,* — U.S. ——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (n. 16) where the court stated that:

> Unlike the calculation of attorneys' fees under the common fund doctrine where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation.

We acknowledge that this discussion suggests the court might view favorably an attorney's fee award based primarily on a percentage of the recovery. Viewed in context, however, we interpret the note to stress that the result obtained in civil rights cases should not normally be used as an independent basis for increasing a fee award. Read in this light, the footnote simply stands for the proposition that in common fund cases the fee award *may* be increased to reward counsel for superior results. Without more, we are unwilling to abandon the traditional lodestar calculation as the starting point in determining an appropriate fee. Recent cases setting fees to be paid out of a common fund in settled antitrust litigation have followed this approach, *In Re Arizona Dairy Products Antitrust Litigation,* 1984–1 Trade Cases ¶ 65,816 (D.Ariz.1984); *In Re Art Materials Antitrust Litigation,* 1984–1 Trade Cases ¶ 65,815 (N.D.Ohio 1984); *In Re Corrugated Container Antitrust Litigation,* 1983–2 Trade Cases ¶ 65,628 (S.D.Tex. 1983); *In Re Chicken Antitrust Litigation,* 560 F.Supp. 963 (N.D.Ga.1980).

■ In summary, the Supreme Court in *Hensley* stated:

The amount of the fee, of course, must be determined on the facts of each case. *Hensley, supra,* 103 S.Ct. at 1937. However the court went on to say:

> The most useful *starting* point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.

*Hensley, supra* at 1939 (emphasis added). We see no basis for saying that this is the appropriate starting point in cases under 42 U.S.C. § 1988, but not so where a reasonable fee is to be awarded out of a common fund. In each instance the competing considerations are the same; providing a sufficient incentive to bring actions asserting violations of federal laws while at the same time, protecting the interests of those who will ultimately pay the fee. Accordingly, we start with a calculation of the lodestar amount and then proceed to determine whether that amount should be increased or decreased based on the unique facts of this case.[13]

## VI. THE LODESTAR CALCULATION

### (1) *The Number of Hours Expended*

On June 15, 1984, counsel for the Brewer and State plaintiffs filed extensive affidavits and appendices which detail the number of hours expended on this litigation from its inception through April 17, 1984. The affidavits and appendices also provide an in depth review of the manner in which the many hours were expended. This has been done both by description on billing statements and by placing the hours into eleven separate categories including such areas as pleadings and briefs, research and review, document discovery, depositions and court appearances. Non-attorney time has been broken down into four sub-categories; research consultant, paralegals, law clerks and legal assistants.

The affidavits of counsel indicate that before submitting the final petition and supporting documents lead counsel, J.E. Gallegos, Esq. and local counsel, Robert F. Hill, Esq., reviewed all hours charged to the two cases and eliminated any that were not beneficial to the prosecution or settlement of the litigation or that were not otherwise productive.

During the afternoon of June 29, 1984, the court conducted a hearing in the United States Courthouse, Santa Fe, New Mexico to consider the final petition for an award of attorney's fees. At that time Mr. Gallegos, lead counsel for plaintiffs, testified and described the manner in which his law firm organized to effectively manage the prosecution of this complex litigation. He also discussed the amount of time this case has demanded since first investigations began in mid-1978. Mr. Gallegos emphasized that litigation costs and attorney hours were kept to a minimum by the use of a core group of attorneys, responsible for the case from start to finish, and by the effective use of paralegals, law clerks and a research consultant.

Also appearing at the June 29, 1984 hearing were two attorneys qualified by the court as experts on the subject of calculating attorneys' fees. Mr. Edwin S. Kahn is a Colorado attorney. He is experienced in complex, class action, antitrust and securities litigation and has been counsel in several major lawsuits of this type. Mr. Stanley Crout is an attorney with similar litigation experience primarily in New Mexico. Each has had experience in cases where attorneys' fees were calculated and awarded by courts using methods similar to the one to be used in this case. It is clear from their testimony and written reports that (1) they have a thorough understanding of the various approaches utilized to calculate attorney fee awards; and (2) they have studied the various aspects of this extremely

---

**13.** We do not consider the argument that the lodestar calculation encourages the padding of hours to be particularly persuasive one. *First,* that argument could be used in cases arising under 42 U.S.C. § 1988. Yet the Supreme Court has expressed a preference for the use of the lodestar in such cases. *Second,* the lodestar formula and the case law speak in terms of the "reasonable" number of hours expended on the case. The courts are free to eliminate unreasonable, padded hours.

complex litigation. Simply stated, they thoroughly understand the intricacies of this case and have taken the time to review the extensive filings.

At the hearing and in his written statement Mr. Kahn stated his view that a fee of 15% in this case was entirely reasonable and, indeed, a modest amount considering all the circumstances. At an earlier hearing on attorneys fees,[14] Mr. Kahn testified concerning the hours expended on this litigation. He stated that he had reviewed most of counsel's time sheets since 1981 and found all hours accounted for and no evidence of padding, churning or duplication. Mr. Kahn felt that counsel had utilized their time much more efficiently than in other similar litigation with which he was familiar.

Mr. Crout expressed views similar to those of Mr. Kahn. As to the fee request generally, he stated that a fee of 15% of the total settlement fund was too low considering the efforts of counsel and the resulting work product. Mr. Crout also stated that the requested 15% was unrealistically low for complex antitrust litigation. Further, Mr. Crout found the management of the case to be efficient, with appropriate division of labors between attorneys and paralegal staff.

Several class representatives also testified. Mr. Ramon Huerta stated that he was aware of the number of hours billed to the case by class counsel. He testified that in the five years he had been involved in the case he had never seen any evidence that the hours had been padded nor did he feel that the number of hours was excessive. This view was also taken by Mr. Mark Fleisher and Ms. Sheila Brewer, two other named representatives of the class. These class members attended virtually all court proceedings and were familiar with all aspects of the settlement negotiations.

We also note that while various individuals have expressed objections to the fees requested in this case, *none* have challenged the number of attorney and non-attorney hours charged by plaintiffs' counsel. Mr. Richard J. Rubin, general counsel for the New Mexico Human Services Department, appeared on behalf of the Honorable Toney Anaya, Governor of the State of New Mexico. Mr. Rubin related the Governor's objections to the fee request. Mr. Rubin testified that the State had no basis upon which to challenge or question the number of hours reported by plaintiffs' counsel. Mr. Rubin had not reviewed the filings in the case or had he studied various aspects of the litigation. None of the other objectors challenged the hours billed to this litigation by the Jones and Hill firms.

The court has conducted its own independent review of the time sheets and other documents provided us by class counsel. We are impressed by the completeness of these records and the detail that explains how blocks of time were expended. In our review we found no evidence of duplication of time or other irregularities.

We note the integrity and professionalism with which class counsel have conducted themselves throughout our involvement in this litigation. This high standard is also manifested in the preparation of the final petition for fees and the supporting documents. It is obvious that these pleadings took a great deal of time and thought to prepare, efforts not charged to the litigation. *See, Ramos, supra* at 558. The records before us establish that counsel exercised "billing judgment" in calculating the hours charged to the litigation, *Hensley v. Eckerhart, supra,* 103 S.Ct. at 1940. The case presents none of the billing problems encountered by the court in *In Re Fine Paper Antitrust Litigation,* 98 F.R.D. 48 (E.D.Pa.1983).

■ In sum, having reviewed the records provided to us by counsel and considering (1) the complexity of this litigation; (2) the length of time the case has been pending; (3) the meandering procedural history of

---

**14.** A hearing on attorneys' fees was held in connection with the Conoco and Consolidated settlements on December 2, 1983 in Albuquerque, New Mexico. No action was taken on the petition before the court at that time.

the case; (4) the statements and affidavits of counsel; and (5) the written and oral statements of the experts, class representatives and various objectors, we find the number of hours reported to be wholly justified and allowable without exception. The records provided by counsel satisfy the requirements set out by the Supreme Court and the Court of Appeals for the Tenth Circuit regarding the documentation and explanation of all hours charged in the litigation. *See, Hensley v. Eckerhart, supra,* 103 S.Ct. at 1939–1940; *Ramos v. Lamm, supra* at 553–554.

Accordingly the following hours are charged to the litigation from early investigations in 1978 through April 17, 1984: [15]

JONES FIRM:

| | |
|---|---|
| A.L. Jaramillo: | 6,657.25 hours |
| J.E. Gallegos: | 6,144.25 hours |
| R.W. Allen: | 4,356.75 hours |
| M.D. Baird: | 2,023.00 hours |
| S.L. Tucker: | 933.50 hours |
| Other Counsel: | 945.50 hours |
| | |
| Research Consultant: | 6,018.75 hours |
| Paralegals: | 16,867.00 hours |
| Law Clerks: | 747.50 hours |
| Legal Assistant: | 53.75 hours |

HILL FIRM:

| | |
|---|---|
| R.F. Hill: | 897.60 hours |
| R.L. Wilcox: | 219.20 hours |
| K.A. Tomb: | 7.20 hours |
| B.J. Musgrave: | 6.20 hours |
| | |
| Paralegal: | 134.70 hours |
| Law Clerk: | 62.40 hours |

**(2) *Hourly Rate:***

▆▆▆ The second step in calculating the lodestar requires the court to assign a reasonable hourly rate to the time charged by each attorney as well as to each sub-grouping within the non-attorney support staff. The starting point, of course, is the current hourly rates suggested by counsel. As the case law instructs, while a consideration, the court is not bound by the hourly rates suggested by petitioners. *Ramos v. Lamm, supra,* at 555; *In Re Corrugated Container Antitrust Litigation,* 1983–2 Trade Cases ¶ 65,628 (S.D.Tex.1983); *In Re Chicken Antitrust Litigation,* 560 F.Supp. 963, 972 (N.D.Ga.1980). The appropriate hourly rate must be determined by considering the attorney's reputation, skill and experience in the particular field; the quality of the lawyer's performance in the case; rates charged by other attorneys with similar reputations, skill and experience practicing in the same field in the same or similar geographic location; and any other factors that may be relevant under the circumstances, *Id.* In determining a fair and reasonable hourly rate the court is not embarking into a strange and unknown field. Unlike the determination of the value of services rendered in other specialties and professions, the value of legal services is within the court's own knowledge. As an attorney and as one who has passed on awards of attorneys' fees in other complex litigation, the court brings its own experience to the question of determining an appropriate hourly rate to be charged, *In Re King Resources Co. Securities Litigation, supra,* at 628.

In the present case, we find it appropriate to set varying hourly rates based on the different tasks performed by a number of the key attorneys participating in this litigation. The different rates are intended to reflect the skill required; the importance of the task; and the responsibility undertaken. Several courts have utilized a similar approach in discussing or setting fees

---

**15.** The Jones firm began working on this litigation in March of 1978. Over the five years since that time, no attorney has averaged more than 1340 hours per year on the case. That is well within the average yearly billable hours for attorneys today, *See, Ramos, supra* at 553. Total attorney hours are roughly equivalent to five attorneys working full time on the lawsuit since its inception. The magnitude and complexity of the case justify this expenditure of time.

We also note that Messrs. Gallegos and Jaramillo spent nearly an equal amount of time attending court proceedings over the past four years. The court in *Ramos* cautioned against duplication of services that might occur when more than one attorney appears on behalf of the client at court hearings, *Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983). In this case, however, the attendance of both Mr. Gallegos and Mr. Jaramillo at most hearings was necessary to adequately represent their clients and address matters raised by the court.

in common fund and civil rights cases, *See,* e.g., *Keyes v. School District No. 1, Denver, Colorado,* 439 F.Supp. 393 (D.Colo. 1977); *In Re Armored Car Antitrust Litigation,* 472 F.Supp. 1357 (N.D.Ga.1979).

We begin with the rates charged by the attorneys from the firm of Jones, Gallegos, Snead & Wertheim.

### (A) Jones Firm—Attorney Rates:

### (1) J.E. Gallegos, Esq.

Mr. Gallegos has been the guiding force in this litigation on behalf of the Brewer and State plaintiffs. As he describes it, his role has been to

> ... provide direction and leadership. This included the selection of the right professional and paraprofessional people to work on this case. It has included the management of the case in terms of our litigation strategy and our settlement negotiations ... [I]t has included the role of first chair counsel at trial and in most court proceedings, principal interrogator in the depositions of fact and expert witnesses and the final editor of court papers.

Verified Statement of J.E. Gallegos, Esq. filed June 15, 1984, at pg. 2. As Mr. Gallegos relates, he was also in charge of the administration of the class, the membership of which now exceeds 300,000 individuals.

Although we have not presided over this entire litigation we have observed Mr. Gallegos for a sufficient time to fully evaluate his abilities. Mr. Gallegos has at all times exhibited advocacy and negotiation skills of the highest order. His superior skills, experience and dedication of purpose have shown through both before the court and in the countless pleadings filed. He has exhibited a thorough understanding of the many intricacies inherently involved in antitrust law, class actions and complex litigation. The quality of his work has been excellent.

By any measure this has been an extremely hard fought and complex antitrust lawsuit. Many substantial legal and evidentiary issues were grappled with by the attorneys and the respective courts. Plaintiffs have faced three of the preeminent antitrust law firms located in the western United States. Throughout the course of this litigation, Mr. Gallegos has directed and coordinated the plaintiffs' attack with a large degree of success. In the end, Mr. Gallegos and the rest of the plaintiffs' legal team fought defendants to the point where the case would be settled or retried. Mr. Gallegos' efforts are perhaps best highlighted by the plaintiffs' success on liability issues in the verdict returned in March of 1982.

Mr. Gallegos has set his normal rate at $120 per hour. Simply stated, this is not a realistic starting point; his hourly fee is too low for this type of case. Prior to taking on this case, Mr. Gallegos had a successful law practice with most cases taken on a contingent fee basis. Mr. Gallegos' Verified Statement indicates that his normal rate of return was approximately twice his stated hourly rate or $240 per hour. This figure is not unreasonable for successful plaintiffs' attorneys retained on a contingent fee basis.

This litigation, of course, has not been a typical contingent fee case. Instead it has been a difficult and bitterly contested price fixing lawsuit. Both the law and the facts have been conceptually difficult to grasp. The defense has been represented by some of the best antitrust attorneys in the nation.

Further, the litigation has required superior negotiating skills and ultimately the ability to understand and take part in a significant corporate acquisition.[16] Given these circumstances, the experts who testified agree that Mr. Gallegos' hourly rate should be set at a figure reflecting rates

---

16. As can be seen from the Stipulation and Agreement of Settlement between the Brewer, State and PNM plaintiffs and Southern Union, dated April 12, 1984, the key provision is the acquisition of Southern Union's New Mexico assets and facilities by PNM. Mr. Gallegos was instrumental in guiding settlement discussions in this direction and working through many of the details of the acquisition.

charged by prominent antitrust attorneys practicing nationwide. From our experience that falls into a range of $200 to $300 per hour.

Mr. Gallegos' hourly rate, however, must also reflect the fact that he had little experience in antitrust law when this case was first filed in 1979. *See,* Verified Statement of J.E. Gallegos, Esq. at pg. 4.

■ The records before us establish that Mr. Gallegos expended 3,080.50 hours in court appearances, depositions and settlement negotiations. *See,* Appendix C–4 to Appendices to Verified Statement of J.E. Gallegos, Esq. Vol. II, filed June 15, 1984. We find that an hourly rate of $200 per hour should be applied to this block of time. It was during trial, depositions and settlement discussions that Mr. Gallegos' skill and expertise were most important. In addition, the responsibilities imposed on Mr. Gallegos were greatest during depositions he conducted alone and in settlement negotiations when he spoke for the interests of the Brewer and State plaintiffs.[17] The rate of $200 per hour is low for attorneys involved in complex antitrust litigation.

Mr. Gallegos' remaining hours are attributed to such tasks as legal research, drafting of pleadings, meetings, communications and overall management of the case. While many attorneys would charge the same hourly fee for this time as for hours expended at trial, etc., we believe that billing judgment would require that a lower rate be assigned to this time. We find that a rate of $150 per hour is appropriate for Mr. Gallegos' remaining hours. This rate accounts for his superior skills and expertise, but also reflects the fact that the remaining tasks were of a less crucial nature.

### (2) Arturo L. Jaramillo, Esq.:

Mr. Jaramillo is a shareholder or partner in the Jones firm. When this case was filed in 1979, he was a relatively new associate. The statements submitted in support of the final petition reveal that, from the outset of this litigation, Mr. Jaramillo has been the attorney in charge of all legal research and written court submissions. Indeed, the time records show that over a five year period Mr. Jaramillo expended in excess of 3,600 hours in researching the law and drafting the pleadings and briefs. *See* Appendix C–14 to Appendices to Verified Statement of J.E. Gallegos, Esq., Vol. II, filed June 15, 1984.

Mr. Jaramillo's efforts have substantially furthered the objectives of the lawsuit. This litigation has been marked by the extensive briefing in many areas of antitrust law. Mr. Jaramillo has been responsible for responding to the numerous affirmative defenses asserted by defendants. In addition, he has been required to respond to the defendants' pivotal arguments concerning the very existence of a potential antitrust violation. All this has occurred within a factual setting unlike most price fixing cases. In every instance, including two rounds of massive summary judgment motions, Mr. Jaramillo has met the challenge.

Mr. Jaramillo has also had increasing responsibility for representing plaintiffs before the court. In several hearings during the past year, Mr. Jaramillo has argued significant and substantive motions on behalf of plaintiffs. In each instance he has

---

17. We realize that $200 per hour for deposition time might seem excessive, given the fact that many depositions involve nothing more than representing the client or witness and making occasional objections to questions propounded. On the other hand, the records before us, as well as the statement of Mr. Gallegos filed on June 15, 1984, establish that much of the deposition time expended by Mr. Gallegos would justify a rate *higher* than $200 per hour. Many of the depositions taken involved adverse witnesses requiring hours of preparation by Mr. Galle-gos. At these depositions, Mr. Gallegos frequently appeared alone faced by numerous defense attorneys. In an attempt to arrive at a proper balance, we have allowed $200 per hour for all deposition time. We also recognize that opinions may differ as to the proper rate to be assigned various tasks. We are of the view, however, that the rates assigned to Messrs. Gallegos, Jaramillo and Hill reflect the importance of each task undertaken and an appropriate rate for each job assignment.

performed in an outstanding manner. His advocacy skills and legal knowledge have shown through in the pleadings filed and the arguments made before the court.

The petitioners have set Mr. Jaramillo's rate at $100 per hour. Like Mr. Gallegos, this is too low a figure to be utilized in the lodestar calculation. Young partners at law firms in the New Mexico and Colorado region frequently charge more for routine work. This has not been a routine case and Mr. Jaramillo's hourly rate should reflect that fact. Mr. Jaramillo worked closely with Mr. Gallegos prior to the filing of this action. Presumably the Jones firm had a return in excess of $100 per hour on Mr. Jaramillo's time in the firm's contingent fee practice. This should also be considered in establishing Mr. Jaramillo's rate for lodestar purposes.

■ Mr. Jaramillo expended 4655.75 hours on drafting pleadings and briefs, conducting research, appearing at court hearings and assisting at trial. These are the three areas where his knowledge and skills were most crucial to the success of the litigation. We find that these hours should be billed at $150 per hour in making the lodestar calculation. Mr. Jaramillo's remaining time should be billed at $125 per hour reflecting rates for similar work by young partners practicing in the Colorado and New Mexico area.

The amounts set also account for the rates assigned to Mr. Gallegos as lead attorney. It is our view that Mr. Jaramillo's rates should bear some similarity to those of Mr. Gallegos, although reduced somewhat because of Mr. Gallegos' experience and overall management role. The rates for Mr. Jaramillo also account for his early lack of experience in the field of antitrust law.

### (3) Robert W. Allen, Esq.:

Mr. Allen joined the Jones firm in 1979, just as this case was filed. Since that time he has been in charge of coordination and administration of written discovery as well as document support for oral discovery. As the record indicates this has been a massive undertaking with hundreds of thousands of documents requested and produced. The court is convinced that a major factor in plaintiffs' success has been the organization and effective use of the materials discovered by plaintiffs. Our review of the file in this case and the testimony of various counsel and experts establish that the plaintiffs' case has been extremely well organized, using computer assisted retrieval systems to keep track of the many documents.

The petitioners have set Mr. Allen's rate at $75.00 per hour. As the third key man in this litigation we are of the view that this should be adjusted to $100 per hour. Without Mr. Allen's effective management of documentary discovery in this case, the plaintiffs' case would have been severely hampered. $75.00 per hour is an appropriate rate for an attorney with five years of experience. It is too low for the responsibility imposed on Mr. Allen and the resulting work product.

■ After full consideration of the hours billed by Mr. Allen, we are of the view that the rate of $100 per hour should apply to all of his time. His experience and responsibilities justify such a rate without regard to the other tasks assigned to him.

### (4) Remaining Attorneys at Jones, Gallegos, Snead & Wertheim:

From the records it appears that 15 other attorneys worked on the litigation over the period from March of 1978 through April 17, 1984. Their time, however, represents slightly less than 25% of the total attorney hours expended on the case. In addition, approximately one-half of the remaining hours were those of an associate billed at $60.00 per hour. We have reviewed the hourly rates for those 15 attorneys as set by the firm. They are entirely proper if not somewhat low under the circumstances. Accordingly we approve of the rates set without modification.

### (B) Jones Firm—Non-Attorney Rates:

### (1) Research Consultant:

Dr. Thomas K. Simpson is a professor at St. John's College, Santa Fe, New Mexico.

Dr. Simpson's educational background is in mathematics, physics and scientific history. Dr. Simpson has assisted the Jones firm in this litigation since 1979. His role has been to analyze the customer records of the Southern Union defendants in order to develop and maintain a record of the membership in the Brewer class. In addition, he has been heavily involved in the development of damages studies based on the pass-through of natural gas price increases from Southern Union to the residential consumers. He also has been a witness at various court proceedings.

Mr. Gallegos has testified on several occasions that Dr. Simpson's assistance was crucial to plaintiffs' case both on damages issues and class management. This is also supported by the testimony of Mr. Kahn. Dr. Simpson's time has been billed at $50 per hour. Based on our knowledge of his role in this litigation and the statements of Messrs. Gallegos and Kahn, we find this rate to be reasonable.

### (2) Paralegals—Law Clerks:

Counsel have made extensive use of the services of paralegals and law clerks. The record before us indicates that this effective use of non-attorney staff has been an important cost saving factor in this case. It has enabled counsel to conserve on the use of attorneys with associated higher rates. Courts have encouraged and commended this type of division of labor. *Ramos v. Lamm, supra* at 558, 559; *Spray-Rite Service Corp. v. Monsanto Co.,* 684 F.2d 1226, 1249–1250 (7th Cir.1982), *affm'd,* — U.S. —, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *World of Sleep, Inc. v. La-Z-Boy Chair Company,* 1982–2 Trade Cases ¶ 64,854 pp. 72,257 (D.Colo.1982); *In Re Chicken Antitrust Litigation, supra* at 977.

Paralegals' and law clerks' time has been billed at $30 per hour. Toney Anaya, Governor of the State of New Mexico, has objected to this rate pointing out

that these individuals are actually paid only $5–$10 per hour. We find this argument to be totally without merit. The hourly rate of each professional and paraprofessional employee must reflect not only base salary, but also fringe benefits and a proportionate share of firm overhead. *Ramos v. Lamm, supra* at 558–559. In other cases, rates of $30–$40 per hour have been allowed for hours expended by paralegals and law clerks. *In Re Chicken Antitrust Litigation, supra* at 977; *In Re Gas Meters Antitrust Litigation,* 500 F.Supp. 956 (E.D.Pa.1980); *Bagel Inn, Inc. v. All Star Dairies,* 539 F.Supp. 107 (D.NJ 1982); *In Re Arizona Escrow Fee Antitrust Litigation,* 1982–83 Trade Cases ¶ 65,198 (D.Ariz. 1982); *In Re Cenco Ins. Securities Litigation,* 519 F.Supp. 322 (N.D.Ill.1981). Accordingly, the hourly rate for paralegals and law clerks will be set at the requested $30 per hour.[18]

### (C) Hill Firm—Attorney Rate:

### (1) Robert F. Hill, Esq.

Mr. Hill is one of the founding partners of the firm of Hill & Robbins. Since its formation the firm has been active in the area of plaintiffs' antitrust and securities litigation.

Mr. Hill has been local counsel in this case under our Local Rule 301 since late June of 1983. During that time he has been actively involved as "lead" local counsel. He has taken part in court hearings and settlement discussions. His firm has had a role in the preparation of many motions and supporting memoranda.

Mr. Hill's stated rate is $140 per hour. Mr. Hill's skill and expertise have been extremely useful in bringing this litigation to a close. Our experience indicates that senior partners in Denver firms accustomed to doing complex litigation frequently charge from $125 to $200 per hour for their services. We are of the view that Mr. Hill should receive $175 per hour for the 647.6 hours billed to depositions, court ap-

---

**18.** The Jones firm also billed a total of 53.75 hours attributed to the work of a legal assistant

at a rate of $25 per hour. We find the hours and hourly rate to be fair and reasonable.

pearances and settlement negotiations. See Appendix B to Affidavit of Robert F. Hill, Esq. Vol. II, filed June 15, 1984. His remaining time should be billed at the rate of $140 per hour. These rates adequately reflect Mr. Hill's skill, expertise and responsibilities. At the same time, like Messrs. Gallegos and Jaramillo, the different rates account for the importance of the tasks assigned to Mr. Hill.

### (2) Remaining Attorneys at Hill & Robbins:

 The records before the court indicate that three other attorneys from the Hill firm worked on this litigation. The three combined billed a total of approximately 235 hours, 219 of which were expended by one associate at a rate of $70 per hour. We find the range of from $70–$90 per hour to be a reasonable amount for Denver area firms of similar size practicing in the same field. These rates are approved without modification.

### (D) Hill Firm—Paralegals and Law Clerks:

We are of the view that the same rate applied to the Jones firm paralegal-law clerk staff should be applied here. Accordingly, the rate of $30 per hour will be used in the lodestar calculation for the Hill firm paralegal-law clerk staff.

### (3) Lodestar Calculation (3/13/78—4/17/84): [19]

**Jones, Gallegos, Snead & Wertheim:**

| Attorneys | Number of Hours | Rate | Total |
|---|---|---|---|
| J.E. Gallegos | | | |
| A) Max Rate | 3,080.50 | $200 | $616,100.00 |
| B) Min Rate | 3,063.75 | 150 | 459,562.50 |
| A.L. Jarmillo | | | |
| A) Max Rate | 4,655.75 | 150 | 698,362.50 |

| Attorneys | Number of Hours | Rate | Total |
|---|---|---|---|
| B) Min Rate | 2,001.50 | 125 | 250,187.50 |
| R.W. Allen | 4,356.75 | 100 | 435,675.00 |
| M.D. Baird | 2,023.00 | 60 | 121,380.00 |
| S.L. Tucker | 933.50 | 100 | 93,350.00 |
| C.A. Purdy | 429.25 | 60 | 25,755.00 |
| C. Gramer | 238.00 | 50 | 11,900.00 |
| H.R. Quintero | 116.50 | 60 | 6,990.00 |
| J. Wertheim | 66.50 | 120 | 7,980.00 |
| A.M. Kepler | 54.75 | 65 | 3,558.75 |
| F.J. Mathew | 16.75 | 75 | 1,256.75 |
| A. Israel | 13.50 | 50 | 675.00 |
| J.W. Wentworth | 3.75 | 100 | 375.00 |
| J.C. Herrera | 2.00 | 75 | 150.00 |
| J.E. Snead | 2.00 | 120 | 240.00 |
| P.V. Culbert | 1.75 | 75 | 131.25 |
| K.A. Hempleman | 0.50 | 60 | 30.00 |
| L. Ares | 0.25 | 60 | 15.00 |
| | | TOTAL | $2,733,674.25 |
| **Non-Attorneys** | | | |
| Research Consultant | 6,018.75 | $50 | $300,937.50 |
| Paralegals | 16,867.00 | 30 | 506,010.00 |
| Law Clerks | 747.50 | 30 | 22,425.00 |
| Legal Assistant | 53.75 | 25 | 1,343.75 |
| | | TOTAL | $830,716.25 |

**Hill & Robbins:**

| Attorneys | Number of Hours | Rate | Total |
|---|---|---|---|
| R.F. Hill | | | |
| A) Max Rate | 647.6 | $175 | $113,330.00 |
| B) Min Rate | 250.0 | 140 | 35,000.00 |
| R.L. Wilcox | 219.2 | 70 | 15,344.00 |
| K.A. Tomb | 7.2 | 90 | 648.00 |
| B.J. Musgrave | 6.2 | 90 | 558.00 |
| | | TOTAL | $164,880.00 [20] |
| **Non-Attorneys** | | | |
| Paralegals | 134.7 | $30 | $4,041.00 |
| Law Clerks | 62.4 | 30 | 1,872.00 |
| | | TOTAL | $5,913.00 [21] |

### VII. ENHANCEMENT OF NORMAL FEES

Having calculated the initial lodestar amount we must now determine whether to increase that figure to reflect certain factors and, if so, by what amount. As we stated earlier, a majority of the cases and the statements of the Supreme Court indicate that the lodestar figure may be increased to reflect whatever criteria are relevant given the facts and circumstances unique to the case. Care must be exercised, however, so that considerations al-

---

**19.** All fee calculations have been for hours billed through April 17, 1984, the date that the settlements with Southern Union were formally announced. Fee and expenses incurred after that date may be the subject of future supplemental petitions.

**20.** This is the total amount owed to the Hill firm for attorneys fees by all plaintiffs. This must be reduced by the fees received from PNM for its representation by the Hill firm as local counsel. That amount is $73,745.60, See, Affidavit of Robert F. Hill, filed on June 15, 1984.

**21.** This is the total paralegal-law clerk amount charged for all plaintiffs. This must be reduced by one-half to reflect time attributable to representation of PNM.

ready reflected in setting hourly rates are not considered a second time to justify an increase or decrease of the base fee award. *Hensley, supra,* 103 S.Ct. at 1940 n. 9; *Ramos v. Lamm, supra* at 557.

 In the instant case we are of the view that the following factors warrant an enhancement of the base lodestar amounts calculated above; (1) benefits conferred—results achieved; (2) risk involved—advance fee arrangements; (3) preclusion of other employment; (4) undesirability of the case; (5) awards in similar cases; and (6) method of payment. These factors will be discussed generally and on a firm by firm basis.

**(1) Benefit Conferred—Results Achieved:**

This is perhaps the most important factor in our determination whether to enhance the lodestar amount. The results obtained in this case have been outstanding. First, considering the monetary aspects of the several settlements, the plaintiffs have recovered between 79% and 108% of all single damages allegedly suffered according to plaintiffs' own damages studies.

Mr. Donkin, plaintiffs' damage expert, testified that this was by far the largest damage recovery as a percentage of total single damages that he has seen in the four antitrust cases in which he has been involved. The experts who testified at the attorneys' fees hearing also agreed that the monetary results achieved were simply outstanding. These are individuals who have been involved in similar litigation and understand the significance of the recovery.

Second, the monetary recovery, while outstanding by itself, is but one element of the overall benefit achieved on behalf of all plaintiffs. Of perhaps equal importance is the removal of Southern Union from the natural gas production and supply industry in the State of New Mexico. From the outset of this lawsuit the plaintiffs had hoped to place Southern Union's natural gas production and supply facilities into the hands of individuals more attuned to the needs and interests of New Mexico residents. The settlement with the Southern Union defendants achieves this goal. Under the terms approved by the court, Public Service Company of New Mexico ("PNM") will acquire these facilities and Southern Union will cease its activities in New Mexico.

This result could not have been achieved outside the overall settlement framework. The attorneys for the Brewer and State plaintiffs, and in particular Mr. Gallegos, were instrumental in developing a settlement package that satisfied this key objective. The plaintiffs anticipate many future benefits to themselves as well as all New Mexico residents as a result of the acquisition of the Southern Union assets by PNM.

Finally, the settlement with Southern Union allows PNM and the Brewer and State plaintiffs to take part in the development and implementation of a plan to renegotiate natural gas supply contracts with the various San Juan producers. In their complaint the plaintiffs had sought injunctive relief as well as monetary damages, hoping to have the gas supply contracts declared null and void and prices returned to a competitive level. The plaintiffs realized, however, that such a remedy might not be available through the courts. The inclusion within the Southern Union settlement of a mechanism to renegotiate the supply contracts provides an avenue to achieve a goal that might have been out of reach had the case been tried. Under the settlement terms, counsel for the Brewer and State plaintiffs will have an active role in the contract renegotiation process which may ultimately result in a reduction in the price of natural gas to New Mexico residents. Thus, the settlement provides the mechanism to achieve plaintiffs third goal; the reduction of natural gas prices charged to the people of New Mexico.

The settlements that have been reached in this litigation have conferred substantial monetary and non-monetary benefits upon the plaintiffs. They have achieved, or are in a position to achieve, each of the three

objectives initially established when this litigation commenced. The results obtained have come as a direct result of the efforts of plaintiffs' counsel. This alone justifies a significant enhancement of the initial lodestar figure.

### (A) Jones Firm:

The Jones firm has represented the Brewer and State plaintiffs since the cases were first filed. Mr. Gallegos has been the principal figure in setting the goals for the litigation and developing the litigation *and* negotiating strategies to reach those objectives. The Brewer and State plaintiffs were represented solely by attorneys from the Jones firm from the summer of 1978 through June of 1983. Several of the monetary settlements occurred during this time period. The full impact of any enhancement premised on the benefit conferred should be reflected in the fee awarded to the Jones firm.

### (B) Hill Firm:

As mentioned above, Mr. Hill became involved in this litigation in late June of 1983. At that time the case had been pending over three years. Liability issues had been tried once, the summary judgment motions had been or were being briefed a second time and several settlements had already been reached. From the beginning of his involvement in this case as local counsel, Mr. Hill has been an active participant as required by our Local Rule 301. Nevertheless, much of the ground work for the eventual benefits conferred upon the plaintiffs had already been laid well before his association with the case.

### (2) Risk Involved—Advance Fee Arrangements:

Pursuant to employment agreements entered into between the Jones firm and the Brewer and State plaintiffs, counsel have been retained solely on a contingent fee basis. The agreements also provide that the amount of any fee award shall be determined by the court.

Of course a contingency arrangement places counsels' fee at risk, dependent on success *and* the degree of success ultimately obtained. To some extent we have considered this risk in setting the hourly rates used in the lodestar formulation. Nevertheless, the facts of the present case require that the lodestar be enhanced to account for risks unique to this litigation.

### (A) Jones Firm:

From the outset, the complexity and magnitude of this litigation have created risks not normally found in contingent fee cases. The unusual degree of risk may be attributed to four factors. *First,* unlike most cases taken on a contingent fee basis, the risks and likelihood of success could not be readily evaluated when the case was first filed. In essence, the Jones firm accepted the case without being able to measure the risks faced by the firm.

*Second,* the success of plaintiffs' cases depended to a great extent on certain procedural questions not present in most litigation. In particular, the question of class certification was, in our view, crucial to plaintiffs' case yet entirely unrelated to the underlying claims. Such procedural hurdles add to the usual level of uncertainty present in most litigation.

*Third,* counsel faced the financial resources and legal talent of some of the larger corporations in the United States. Risk increased because of the inequality in resources available to the opposing parties.

*Finally,* the Jones firm was forced to devote a great many hours to the case at early stages in the litigation. Thousands of hours were billed before venue and class certification issues were resolved. Many more were expended before any settlement negotiations occurred. Thus the degree of commitment required increased the risks to the Jones firm beyond those normally associated with contingent fee cases.

### (B) Hill Firm:

The firm of Hill & Robbins became involved in this case in June of 1983. By that time many of the crucial procedural

questions had been resolved and the plaintiffs' risks reduced accordingly. In addition summary judgment motions had been decided once in plaintiffs' favor and a jury had returned a verdict for the plaintiffs on liability issues. Finally, the Hill firm was not called upon to invest the time that the Jones firm had in the formative stages of this litigation.

More important, however, because the Hill firm acted as local counsel for PNM as well as the Brewer and State plaintiffs, one half of all the Hill firm's fees was paid by PNM according to the firm's stated hourly rates. This partial payment of fees reduced the risks faced by Hill & Robbins.[22] Accordingly, the Hill firm is not entitled to the same enhancement for risk that must be applied to the Jones firm lodestar figures.

### (3) Preclusion of Other Employment:

Like the element of risk, this factor has, to some degree, been accounted for in the hourly rates set as part of the lodestar calculation. Fees based on current as opposed to historic hourly rates reflect the fact that other work which might have resulted in prompt payment of fees was denied counsel. In addition, it must be acknowledged that the hours expended on this litigation could not have been spent on other work. Therefore, there is little or no loss of billable hours as a result of this case.

Nevertheless, we are of the view that the lodestar should be enhanced somewhat to reflect the firm-wide dislocation that occurred as each firm became involved in this case. While billable hours may not have been sacrificed, new clients as well as the business of existing clients' were no doubt turned away because of a substantial commitment to this litigation.

Each of the firms involved is small in size. The dedication of a key partner's time to one particular case means that he or she is not available to oversee other cases. Without someone with superior skills and experience to supervise new cases that work must be turned away. This is particularly relevant to the Hill firm. The firm consists of six attorneys. Mr. Hill's affidavit indicates that his unavailability caused the firm to turn over continuing litigation to other firms and to refuse the work offered by substantial new clients. This has an impact on the firm beyond the hours billed by Mr. Hill. It means the loss of existing and potential clients and the loss of the work to the firm. Mr. Hill's affidavit also shows that a good deal of business was turned away by his firm in anticipation of his daily involvement in the ten week trial of this case. The settlement with Southern Union eliminated the need for a trial and deprived Mr. Hill of hours he reasonably expected to bill to this case. Had he known that this would occur, the Hill firm could have accepted work that was turned away thereby covering the hours lost when the trial was vacated. This aspect of preclusion of other employment is not reflected in the lodestar hourly rate, and therefore should be considered in determining the proper enhancement factor.

### (4) Undesirability of the Case—Public Policy:

Because of the high risk and time commitments associated with this litigation most law firms would not have agreed to represent the various plaintiffs. The attorneys' fees provisions of the antitrust laws and the common fund doctrine are designed to encourage the representation of plaintiffs in difficult and complex cases and in situations where plaintiffs cannot otherwise afford representation. The amount of the fee award must also work to encourage attorneys to take undesirable cases whether undesirability stems from the risks involved or the stigma attached to a particular type of case.

In addition, the fee award should further the public policy of encouraging private individuals to seek out and bring to light violations of the nation's antitrust laws.

---

**22.** *See* footnote 20, *supra.*

This policy recognizes the limited enforcement resources available to the federal government. Many of the most significant antitrust cases have been brought by private individuals or entities who have discovered violations impacting on their lives or livelihood.

The instant case is particularly unique in that one of the plaintiffs is a class of residential consumers. Without the knowledge that a fair and reasonable fee reflecting the quality of the work, the benefits obtained, the risks undertaken and the public policies advanced, it is unlikely the class would have found representation. The fee must be enhanced to provide an incentive, encouraging this type of representation in the future.

**(5) Awards in Similar Cases:**

Comparison with awards in other cases is a difficult task. The problem, of course, centers on the definition of the word "similar". We doubt that any other case has a procedural history quite like the present lawsuit. Nevertheless, comparisons are useful as a check on the reasonableness of the fee award.

The comparison may be made in at least two ways: (1) review of the enhancement factor used in other cases and (2) comparison of awards by percentage of total recovery.

Comparing multiples used to enhance the initial lodestar amount, we find that in cases involving similar claims and a "similar" procedural background the multiple used has ranged from 2.0 to 4.0, *In Re Corrugated Container Antitrust Litigation,* 1983–2 Trade Cases ¶ 65,628 (S.D.Tex. 1983), (up to 4.0); *In Re Arizona Escrow Fee Antitrust Litigation,* 1982–83 Trade Cases ¶ 65,198 (D.Ariz.1982) (up to 3.1); *J.N. Futia Co. Inc. v. Phelps Dodge Industries, Inc.,* 1982–2 Trade Cases ¶ 64,978 (S.D.N.Y.1982), (3.0 multiplier used); *McDonald v. Johnson & Johnson,* 546 F.Supp. 324 (D.Minn.1982) (3.0 multiplier used); *In Re Cement & Concrete Antitrust Litigation,* 1980–81 Trade Cases ¶ 63,798 (D.Ariz.1980) (up to 2.85); *In Re*

*Gas Meters Antitrust Litigation,* 500 F.Supp. 956 (E.D.Pa.1980) (2.5 multiplier used); *In Re Chicken Antitrust Litigation,* 560 F.Supp. 963 (N.D.Ga.1980) (1.5 to 2.25 multiplier used).

When comparing fees as a percentage of total recovery we find the range is generally from 10% to 30% in similar antitrust cases; *In Re Ampicillin Antitrust Litigation,* 526 F.Supp. 494 (D.D.C.1981) (45%); *In Re Arizona Escrow Fee Antitrust Litigation,* 1982–83 Trade Cases ¶ 65,198 (D.Ariz.1982) (30%); *Clarke v. Amerada Hess Corp.,* 500 F.Supp. 1067 (S.D.N.Y. 1980) (30%); *Trist v. First Federal Savings & Loan Assn. of Chester,* 89 F.R.D. 8 (E.D.Pa.1980) (25%); *J.N. Futia Co., Inc. v. Phelps Dodge Industries, Inc.,* 1982–2 Trade Cases ¶ 64,978 (S.D.N.Y.1982) (23.4%); *In Re Montgomery County Real Estate Antitrust Litigation,* 83 F.R.D. 305 (D.Md.1979) (22.2%); *Bagel Inn, Inc. v. All Star Dairies,* 539 F.Supp. 107 (D.N.J.1982) (20%); *In Re Master Key Antitrust Litigation,* 1978–1 Trade Cases ¶ 61,887 (D.Conn. 1977) (19.6%); *In Re Chicken Antitrust Litigation,* 560 F.Supp. 963 (N.D.Ga.1980) (10.45%); *In Re Corrugated Container Litigation,* 1983–2 Trade Cases ¶ 65,628 (S.D.Tex.1983) (9%).

**(6) Method of Payment:**

Counsel has suggested a payment schedule that would extend payments through January of 1986. Under this approach, or one tied to the distribution of settlement funds to plaintiffs, counsel would not receive full payment for approximately two years. While petitioners have not sought interest on awarded but unpaid fees, the funds held by the court on behalf of the class has been and will continue to earn interest at market rates. We are of the view that the lodestar amount should be enhanced to reflect future delays in payments of attorneys fees earned through April 17, 1984. This seems fair given the fact that the settlement funds will continue

**1534**

to earn interest until paid to the Brewer and State plaintiffs.[23]

## VIII. OBJECTIONS TO FEES REQUESTED

Objections to the fees as *requested* by plaintiffs' counsel have come from three sources: the class generally; Mrs. Betty Ross, a class member; and the Governor of the State of New Mexico as a representative of the citizens of New Mexico and as a class member.

A number of class members submitted general objections to the fee requested in response to the notices of settlement sent out in May of this year. These objections, however, raise no substantive issues to which the court may respond. Instead these class members simply object to the supposed exhorbitant amount of the request.

Mrs. Betty Ross is a Brewer class member. At the hearing held on June 29, 1984, Mrs. Ross was represented by Joseph T. Sprague, Esq. an attorney practicing in Albuquerque, New Mexico. On behalf of Mrs. Ross, Mr. Sprague objected to the "benefit" or percentage of recovery approach to calculating the attorneys' fees and advocated the use of the lodestar method. Mr. Sprague also voiced some objection to any consideration of the benefit conferred in calculating the fee award.

Having utilized the lodestar method to calculate the fee award in this case, Mrs. Ross' primary objection has been eliminated. To the extent she objects to a consideration of the benefit conferred, this objection has been clearly refuted by the Supreme Court in *Hensley, supra*, 103 S.Ct. at 1940, 1943.

Governor Toney Anaya of New Mexico has raised essentially four objections not previously addressed in this Order.[24] First, the Governor argues that the hourly rates set as part of the lodestar calculation should take into consideration the fact counsel received interim fee awards during the course of the litigation. That is, the court should not use current hourly rates without accounting for the impact of payments received several years ago when rates were lower.

What the Governor fails to recognize, however, is the nature of the interim awards and the impact that the timing of those awards has on the overall fee. Neither the interim allowance authorized in November of 1981 by Chief Judge Bratton nor the later award authorized by this court in March of 1984 made any attempt to calculate the proper hourly rate to be assessed or what multiplier, if any, should be applied. The clear intent of each order was to provide plaintiffs' counsel with sufficient funds to keep the case moving. All parties clearly understood that any ultimate fee award would equal or exceed the interim allowances. It was the intention of this court and Judge Bratton that the interim allowances would be deducted from any final award after the entire award was calculated. Accordingly, we see no method to accurately reduce the final award to reflect interim allowances other than a deduction from the total final award. Furthermore, we see no reason to do otherwise.

The Governor next contends that any risk factor used to enhance the lodestar figure should be reduced because of the prior interim allowances. Again, we cannot agree. The prior interim allowances did not account for the risks incurred by counsel before any interim fees were paid. Therefore, the risk factor should be carried over to reflect that fact. Indeed, the greatest risk existed before the settlements which resulted in the first interim allowance in November of 1981. Without a determination, at that time, of the number of hours being compensated and the risk fac-

---

23. There may be tax advantages to delaying full payment of attorneys' fees. Nevertheles, we are of the view that the fee award should be modified to reflect future delays in payment.

24. Governor Anaya also objected to any enhancement of the fee to account for the quality of the attorneys' services. That factor has been considered in arriving at the appropriate hourly rate and was not utilized in determining whether to enhance the lodestar amount.

tor employed, it would now be unfair to attempt to compute any reduction of risk stemming from the interim allowances. Other courts have refused to alter final fee awards to account for earlier settlements or prior interim fee awards. *See,* eg., *In Re Corrugated Container Antitrust Litigation, supra; Chisholm v. United States Postal Service,* 570 F.Supp. 1044, 1045–46 (W.D.N.C.1983).

■ The Governor also objects to the use of any multiplier to enhance the lodestar calculated for paralegal and law clerk hours. We disagree. To the extent that enhancement reflects the benefit conferred, the risks undertaken, the future delay in payment and awards in similar cases some factor should apply to non-attorney time. Other cases have applied appropriate multipliers to paralegal and law clerk lodestars. *In Re Chicken Antitrust Litigation, supra; In Re Cement & Concrete Antitrust Litigation,* 1980–81 Trade Cases ¶ 63,798 (D.Ariz.1980); *Black Gold Ltd. v. Rockwool Industries, Inc.,* 529 F.Supp. 272 (D.Colo.1981) rev'd on other grounds, 732 F.2d 779 (10th Cir.1984).

We do find, however, that a multiplier should not be applied to the hours expended by Dr. Simpson in his capacity as a consultant to the Jones firm. Dr. Simpson was not an employee of the Jones firm, his role being more like that of an independent contractor. The records before us do not indicate that the Jones firm incurred overhead expenses in connection with the employment of Dr. Simpson. Given these circumstances, Dr. Simpson's time should be viewed more as a litigation expense and accounted for like other expenses without the imposition of a multiplier to the basic lodestar amount.

Finally, the Governor maintains that a maximum multiplier of 1.5 should be applied in this case, objecting to the higher multipliers suggested by petitioners. We are of the view, however, that the Governor's recommended enhancement factor does not adequately account for the benefits conferred upon plaintiffs through the efforts of counsel. Nor does the 1.5 multiplier represent a realistic valuation of the other factors warranting enhancement in this case. Accordingly, we reject his suggested multiplier.

### MULTIPLIERS TO BE USED

Based on our discussion above and the factors that warrant enhancement of the lodestars in this case, the following multipliers are used to enhance the initial lodestar amounts:

**Attorneys**

| | |
|---|---|
| Jones, Gallegos, Snead & Wertheim: | 3.35 |
| Hill & Robbins: | 3.00 |

**Paralegals—Law Clerks**

| | |
|---|---|
| Both firms: | 1.50 |

We note that these multipliers fall well within the range of enhancement factors utilized in similar cases.

### CALCULATION OF FEES
#### (3/13/78 through 4/17/84)

**Jones, Gallegos, Snead & Wertheim**

| | |
|---|---|
| Total Attorney Lodestar: | $ 2,733,674.25 |
| Multiplier: | 3.35 |
| Sub-Total Fee: | $ 9,157,808.74 |
| Total Paralegal— Law Clerk Lodestar: | $ 529,778.25 |
| Multiplier: | 1.50 |
| Sub-Total Fee: | $ 794,668.13 |
| Research Consultant Lodestar: | $ 300,937.50 |
| Total Fee: | $10,253,414.37 |
| Interim Awards: | (2,492,400.00) |
| Remaining to be Paid: | $ 7,761,014.37 |

**Hill & Robbins**

| | |
|---|---|
| Total Attorney Lodestar: | $ 91,134.40[25] |
| Multiplier: | 3.00 |
| Sub-Total Fee: | $ 273,403.20 |
| Total Paralegal—Law Clerk Lodestar: | $ 2,956.50[26] |
| Multiplier: | 1.50 |
| Sub-Total Fee: | $ 4,434.75 |
| Total Fee: | $ 277,837.95 |

**25.** This is the amount reduced by PNM's payments discussed in footnote 20, *supra.*

**26.** This is the amount owed, reduced by one-half to account for the hours attributable to representation of PNM.

The fee award calculated above, including interim allowances comes to 13.97% of the total of all settlements negotiated in this litigation. This percentage is also well within the range of awards in similar cases.

## IX. COSTS

On June 15, 1984, counsel for plaintiffs filed a separate Final Report and Petition for Reimbursement of Litigation Costs. The petition covers expenses incurred through May 31, 1984.

We have reviewed the petition and supporting documents including a report submitted by the accounting firm of Hallquist, Thurman and Associates, P.C. of Santa Fe, New Mexico. The report summarizes costs incurred and payments received from the inception of this lawsuit through May 31, 1984. We find that the request for reimbursement of $722,768.58 is fully documented and supported by the petition and related documents. Accordingly, we will authorize reimbursement of the total amount.

We also note that pursuant to the terms of the overall settlement with the Southern Union defendants, PNM has agreed to pay the Brewer and State plaintiffs $750,000 as reimbursement of litigation expenses. That amount is scheduled to be paid upon closing of the settlement. The court *DIRECTS* that those funds be used to reimburse the Brewer and State settlement funds for costs allowed by the court above.

## X. FUTURE ATTORNEYS FEES AND COSTS

The court will not, at this time, advance plaintiffs' counsel attorneys fees and expenses to complete work on the closing of the Southern Union settlements. Instead, counsel should submit a detailed supplemental petition once closing has been accomplished. The petition should utilize the higher lodestar hourly rates for attorney hours calculated in this order. In our view, the tasks necessary to accomplish the closing justify the use of the higher rates set for Messrs. Gallegos, Hill and Jaramil-

lo. Counsel should exercise prudent judgment, however, in the work assigned to various attorneys to achieve closing. No multiplier or enhancement factor will be allowed for hours expended after April 17, 1984.

After closing of the Southern Union settlement counsel for the Brewer class should submit supplemental petitions for award of attorneys fees and costs every ninety (90) days accounting for the hours billed and costs incurred during the previous 90 day period. Attorneys' fees should be calculated utilizing the lower lodestar hourly rates established for Messrs. Gallegos, Hill and Jaramillo. The administrative responsibilities required once the settlements have closed do not justify the higher hourly rates.

The discussion above constitutes our findings of fact and conclusions of law pursuant to Rule 52(a) of the F.R.C.P.

## ORDER

Pursuant to our findings of fact and conclusions of law the court hereby ORDERS and DIRECTS that Judgment be entered by the Clerk of the Court as follows:

The firm of Jones, Gallegos, Snead & Wertheim is awarded the sum of $10,253,-414.37 for the representation of the Brewer and State plaintiffs for the period beginning March 17, 1978 and ending on April 17, 1984. This amount must be reduced by the earlier interim awards allowed totalling $2,492,400.00. The unpaid fees presently owed are $7,761,014.37.

Of the total unpaid amount the sum of $7,551,575.97 shall be paid out of the Brewer class settlement fund. This represents the Brewer class share of the total attorneys' fees awarded less interim payments by the Brewer class of $2,061,000.00. The State plaintiffs' shall pay the sum of $209,-438.40 which represents their share of all attorneys' fees awarded less interim payments of $431,400.00.[27] The firm of Hill & Robbins is awarded the sum of $277,837.95 in unpaid fees. The Hill firm received no interim allowance of fees. Of this total

---

27. The Brewer and State plaintiffs have agreed

to divide the total attorneys' fees and costs owed

award the amount of $260,473.08 shall be paid out of the Brewer class settlement fund and $17,364.87 from the State plaintiffs' settlement fund.[28]

The court also DIRECTS the payment of the sum of $722,768.58 to the firm of Jones, Gallegos, Snead & Wertheim as reimbursement of all litigation expenses through May 31, 1984. The Jones firm shall in turn pay all unpaid bills stemming from this litigation with the amount awarded. Of this amount, $677,595.54 shall be paid by the Brewer class and $45,173.04 by the State plaintiffs. The $750,000.00 in litigation expenses to be reimbursed by PNM shall be paid over to the Brewer and State plaintiffs in the same proportions as used to determine the amount of fee and expenses owed by each plaintiff group.[29]

The timing of the above payments shall be as follows:

1. Litigation expenses of $722,768.58 shall be paid immediately out of the Brewer class and State plaintiffs' settlement funds now on hand. The Clerk of the Court together with the Special Master, Mr. Arnold Idelberg, C.P.A., are DIRECTED to effectuate payment.

2. The sum of $277,837.95 shall be paid to the firm of Hill & Robbins upon closing of the Southern Union settlement. This amount shall be paid as follows: $260,473.08 by the Brewer class and $17,364.87 by the State plaintiffs.

3. The sum of $2,587,004.79 shall be paid to the firm of Jones, Gallegos, Snead & Wertheim upon closing of the Southern Union settlements.[30] Out of this amount, the sum of $209,438.40 shall be paid by the State plaintiffs in complete satisfaction of their fee obligations. The remainder shall be paid out of the Brewer class settlement funds as a partial payment of their fee.

4. The sum of $2,587,004.79 shall be paid to the firm of Jones, Gallegos, Snead & Wertheim upon completion of the first scheduled reimbursement of settlement funds to members of the Brewer class.

5. The sum of $2,587,004.79 shall be paid to the firm of Jones, Gallegos, Snead & Wertheim upon completion of the second and final scheduled reimbursement of settlement funds to members of the Brewer class.

The court DIRECTS that counsel for the Brewer and State plaintiffs also be reimbursed all gross receipts taxes payable on the attorneys' fees allowed above. These shall be paid on each disbursement of fees discussed in paragraphs 2–5 above.

Lastly, the court has reviewed and considered Mrs. Betty Ross' Petition for Allowance of Attorney's Fees filed on or about July 10, 1984. We find that Mrs. Ross did not contribute substantially to the resolution of attorneys' fees issues in this case. Accordingly, her petition is DENIED.

---

28. *See* footnote 27, *supra.*

29. Like the attorneys' fees the litigation costs awarded should be divided by the relative percentage of all settlement funds received (93.75%/6.25%). *See* footnote 27, *supra.*

by the relative percentage of all settlement funds received by each plaintiff group. By this approach the Brewer class is responsible for 93.75% of all fees and costs, with the State plaintiffs picking up the remaining 6.25%.

30. This represents one-third of all fees owed to the Jones firm.